Filed 7/29/21  P. v. Hernandez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Amador)

----

| | |
|---|---|
| THE PEOPLE, | C089632 |
| Plaintiff and Respondent, | (Super. Ct. No. 18CR27922) |
| v. | |
| ERIC HERNANDEZ, | |
| Defendant and Appellant. | |

Defendant Eric Hernandez was convicted by a jury of one count of criminal threat (Pen. Code, § 422);[1] one count of injuring a spouse, cohabitant, fiancée, girlfriend, or child's parent (§ 273.5, subd. (a)); two counts of misdemeanor vandalism (§ 594, subd. (a)); and one count of driving or taking a vehicle without consent (Veh. Code, § 10851, subd. (a)).  In a bifurcated proceeding, defendant was found to have served a

---

[1]    Undesignated statutory references are to the Penal Code.

prior prison term.  (§ 667.5, former subd. (b).)  The trial court sentenced defendant to an aggregate indeterminate term of 25 years to life in prison with an additional one-year enhancement in accordance with section 675.5, former subdivision (b).

On appeal, defendant contends:  (1) this court should reverse defendant's criminal threat conviction because the trial court had a sua sponte duty to instruct the jury on the lesser included offense of attempted criminal threat, and (2) we must strike defendant's one-year prior prison term enhancement because Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill 136) applies retroactively to cases not yet final on appeal and eliminates the enhancement imposed.

We conclude the trial court did not err by not instructing on the lesser included offense of attempted criminal threat.  However, defendant's one-year prior prison term enhancement must be stricken.  We affirm defendant's convictions and strike defendant's one-year prior prison term enhancement.

## BACKGROUND

### *Prosecution Evidence*

Defendant and his girlfriend, Vanessa G., lived together with Vanessa's friend, M.R.  In October 2017, defendant and M.R. began a secret affair despite defendant's continuing relationship with Vanessa.  Defendant and M.R. both moved out of the residence around July 2018 and continued their affair without Vanessa's knowledge.

Defendant and M.R. had an argument about the fact that Vanessa, rather than M.R., had purchased bus tickets for defendant's children to visit from Los Angeles.  M.R. testified that she found out from the Greyhound Web site that Vanessa purchased the tickets.  She stated that she did not use a password or a confirmation code to get that information.

In mid-August 2018, M.R. loaned defendant her 2002 Ford Taurus.  On September 12, 2018, M.R. told defendant on the phone that she wanted it back.  She said she would

2

report it stolen if he did not return it. Defendant became angry and said he was "coming up" to talk. M.R. said "no, don't come up here."

Defendant went to M.R.'s house around 11:00 p.m. on September 12, 2018. Defendant let himself into the house and went to M.R.'s bedroom. They began arguing. He called her names, and when she got up to leave, he hit her. He closed the door, pushed her on the bed, and hit her with both an open hand and a closed fist. Defendant pushed M.R. onto the bed and placed his hands around M.R.'s neck, squeezing her until she "wasn't able to breathe." Around this time, defendant told M.R. "I'm going to fucking kill you."

M.R. believed that defendant would carry out his threat. M.R. tried to fight back, scratching his face. He choked her until she lost consciousness. When M.R. regained consciousness, defendant was sitting on the floor of her room. Defendant continued calling her names.

That night, defendant broke nearly everything in her room. In an enraged state, defendant broke a television stand after throwing it against the wall. He pulled a fan out of the wall and threw it across the room; he pulled bins from M.R.'s dresser and threw her clothing all over the room; he broke some of her shoes and bras. As defendant destroyed the items in her room, M.R. sat on the bed, crying, and asking him why he was doing this. He told her it was all her fault. Defendant demanded that M.R. give him her phone when he heard a message notification. M.R. refused because she needed her phone in case she would be notified that her pregnant sister went into labor. Defendant told M.R. that if she didn't give him the phone, her unborn niece "wouldn't see past two weeks." Defendant was at M.R.'s house for about three hours. M.R. testified that she was afraid of him "[t]he whole night." From the time that she regained consciousness after he strangled her, M.R. looked for a way to leave.

At some point in the night, defendant pulled M.R.'s hair, ripping a chunk of it out. He heated a barbecue lighter, said, "I'm going to make you remember me," and held the

3

hot lighter to her hand, burning her. Defendant taunted M.R. throughout the night, slapping her on the top of the head with an open hand. He pinned her down on the bed, holding her by the arms so hard that he left bruises. As a result of defendant's physical assault, M.R. had visible bruising on her arms and neck for several weeks.

M.R. escaped the house by pretending to check the property for a possible trespasser. Defendant left the property in M.R.'s Ford Taurus. M.R. drove to the Jackson Rancheria Casino to talk with L.S. (M.R.'s landlord & roommate). She then drove to a hospital parking lot where she thought about what had happened.

A couple hours after she left her house, M.R. realized that defendant had left his phone in her room. After calling him at his mother's house (where defendant was living at the time), M.R. noted that defendant was no longer enraged. She decided to take his phone to him around 3:00 a.m. When M.R. got to defendant's mother's house, they discussed what had happened. He started "loving on" M.R., told her that "if [she] didn't get him so mad, he wouldn't react like this." Defendant and M.R. had sex in the garage.

Before M.R. left, defendant pulled out the title to the Ford Taurus, held her by the back of the neck, and told M.R. to sign it over to him. She had kept the title in a safe at her house, and although she never gave the title to defendant, he knew where she kept the key to the safe. As defendant continued holding her by the back of the neck, M.R. dated the title, started signing the first letter of her first name, and then decided not to sign it. She dropped the title on the ground and left, going back to her home. She did not take the title with her because "[t]hat would just give him another reason to come after me."

On September 13, defendant asked M.R. to buy his son a video game. She did, and then dropped it off at defendant's work. On September 24, M.R. picked up defendant from work and he paid her for his half of the telephone bill.

On September 26, M.R. met defendant in a Save Mart parking lot, with plans for defendant to return the phone that M.R. had given him, and M.R. was going to give him his money back from his half of the phone bill. During the exchange, the two began

4

arguing. Defendant held her against the side of her car, squeezing her upper arms hard enough that he left bruises. He also tried to kiss her. M.R. and defendant went to Reno together on September 29, 2018, to attend Street Vibrations. They rented a hotel room in Carson City.

On September 30, 2018, defendant asked M.R. if he could see her. She told him, "I don't need to see you anymore, you don't need to see me anymore, let's just leave it there." M.R. was napping at home when she heard L.S. yelling at someone to get off the property. It turned out to be defendant. L.S. called for M.R., and M.R. went outside. There was glass from M.R.'s car's windows on the ground. M.R. sought a restraining order against defendant on October 3, 2018. She did not mention in her application that defendant had threatened to kill her on September 12.

Defendant had a prior history of domestic violence. In May 2018, defendant pled no contest to a misdemeanor count of injuring a spouse or cohabitant. That incident involved Vanessa who was photographed by police officers with bruising on her cheek.

### Defense Evidence

Defendant's mother testified that she did not notice any scratches on defendant's face on September 13, 2018.

Vanessa testified that defendant was still her boyfriend, and that he did not have scratches on his face on September 13, 2018. She also testified that she purchased Greyhound bus tickets for defendant's children to visit, wrote the confirmation down, and gave it to defendant. She was unable to check on the status of the reservations without using a confirmation number. Vanessa also denied that defendant hit her in April 2018, despite reporting it to the police.

Defense investigator Kimberly Barraza testified that she researched the Greyhound Web site and was unable to access any reservation information without both a last name and confirmation number.

5

# DISCUSSION

## I.

### *Duty to Instruct on Attempted Criminal Threat*

Defendant contends the trial court erred by failing to instruct the jury sua sponte on the law of attempted criminal threat as a lesser included offense of criminal threat. We disagree.

### A. *The Trial Court Refused to Instruct on the Lesser Included Offense*

The trial court instructed the jury on criminal threat as charged. (§ 422.) It did not instruct on attempted criminal threat, which was not charged. (§§ 422, 664.) Defendant's counsel did not request an instruction on attempted criminal threat. However, defendant's attorney argued in his closing statement that M.R.'s fear was not sustained. The jury convicted defendant of making a criminal threat.

### B. *Duty to Instruct on Lesser Included Offenses*

In every criminal case, the trial court must instruct the jury on the general principles of law relevant to the issues fairly raised by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) This duty includes instructing on lesser included offenses if evidence is presented that, " 'if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 866.) "The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given." (*Breverman*, at p. 154.) The trial court's sua sponte duty thus "prevents the 'strategy, ignorance, or mistakes' of either party from presenting the jury with an 'unwarranted all-or-nothing choice,' encourages 'a verdict . . . no harsher or more lenient than the evidence merits' [citation], and thus protects the jury's 'truth-ascertainment function' [citation]." (*Id.* at p. 155, italics omitted.)

6

In deciding whether there is substantial evidence to support a lesser included offense instruction, a court determines only the bare legal sufficiency of the evidence, not its weight. (*Breverman*, *supra*, 19 Cal.4th at p. 177.) In doing so, courts "should not evaluate the credibility of witnesses," which is a task for the jury. (*Id.* at p. 162.) This substantial evidence requirement is not satisfied by " ' " 'any evidence . . . no matter how weak,' " but rather by evidence from which a jury composed of reasonable persons could conclude "that the lesser offense, but not the greater, was committed." [Citation.]' " (*People v. Souza* (2012) 54 Cal.4th 90, 116, italics omitted.)

We independently review the trial court's refusal to instruct on a lesser included offense to determine whether substantial evidence supported the giving of the instruction. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)

An attempt to commit a specific intent crime is generally considered a lesser included offense of the completed crime. (*In re Sylvester C.* (2006) 137 Cal.App.4th 601, 609.) The crime of criminal threat is a specific intent offense set forth in section 422. "In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat--which may be 'made verbally, in writing, or by means of an electronic communication device'--was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228 (*Toledo*).)

Attempted criminal threat is a lesser included offense of making a criminal threat. (*Toledo*, *supra*, 26 Cal.4th at p. 230.) As the California Supreme Court explained in *Toledo*, "a defendant properly may be found guilty of attempted criminal threat whenever, acting with the specific intent to commit the offense of criminal threat, the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action. Furthermore, in view of the elements of the offense of criminal threat, a defendant acts with the specific intent to commit the offense of criminal threat only if he or she specifically intends to threaten to commit a crime resulting in death or great bodily injury with the further intent that the threat be taken as a threat, under circumstances sufficient to convey to the person threatened a gravity of purpose and an immediate prospect of execution so as to reasonably cause the person to be in sustained fear for his or her own safety or for his or her family's safety." (*Id.* at pp. 230-231.)

A variety of circumstances fall within the reach of the offense of attempted criminal threat. (*Toledo, supra*, 26 Cal.4th at p. 231.) Such situations generally involve "a fortuity, not intended by the defendant, [that] has prevented the defendant from perpetrating the completed offense of criminal threat itself." (*Ibid.*) For example, "if a defendant takes all steps necessary to perpetrate the completed crime of criminal threat by means of a written threat, but the crime is not completed only because the written threat is intercepted before delivery to the threatened person, the defendant properly may be found guilty of attempted criminal threat." (*Ibid.*) Likewise, "if a defendant, with the requisite intent, orally makes a sufficient threat directly to the threatened person, but for some reason the threatened person does not understand the threat, an attempted criminal threat also would occur." (*Ibid.*) "[I]f a defendant, again acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not actually cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person

8

reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*Ibid.*) The word "sustained," as used in section 422, refers to " 'a period of time that extends beyond what is momentary, fleeting, or transitory.' [Citation.]" (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349, fn. omitted.) With these principles in mind we turn to our analysis.

*C. Analysis*

Defendant contends that there is substantial evidence that M.R.'s fear was not "sustained" within the meaning of section 422. He reasons that M.R. was not in sustained fear for her safety because (1) only hours after the physical altercation on September 13, M.R. "chose to drive to [defendant]'s mother's house to give [defendant] his phone" which he had left in her room; (2) while she was there, she had sex with defendant in the garage; (3) M.R. chose to meet defendant at his job later that day to give him the video game he had asked her to buy for his son; and (4) M.R. did not mention that defendant threatened to kill her in her restraining order application. Defendant agrees there was substantial evidence to support a criminal threat conviction. Defendant also argues there was substantial evidence to support an attempted criminal threat conviction because M.R.'s subsequent conduct could be used to impeach her testimony that she was afraid of defendant during the relevant time period, the confrontation at M.R.'s house. We disagree.

We conclude that the evidence did not warrant an instruction on attempted criminal threat. M.R.'s testimony established that she heard defendant threaten her, she understood the threat, she believed that the defendant was capable of carrying out the threat, and she suffered sustained fear of defendant beyond what is momentary, fleeting, or transitory. The victim's testimony about the incident at the house and her subsequent conduct in seeing defendant after the incident at the house is not in direct conflict, and

9

any suggestion that the victim was not in sustained fear during the relevant time period is completely unsupported by any evidence pertaining to that particular issue.

We are not persuaded by defendant's reliance on *Toledo*, *supra*, 26 Cal.4th 221. In *Toledo*, the defendant and his wife Joanne were arguing. (*Id.* at pp. 224-225.) The defendant in *Toledo* "threw a telephone into a closet door, tossed a chair across a room, and punched a hole through a bedroom door"; Joanne told him that she did not care if he destroyed the apartment. (*Id.* at p. 225.) He said, " 'You know, death is going to become you tonight. I am going to kill you.' " (*Ibid.*) She responded that she did not care and walked away. He approached her with some scissors and plunged them toward her neck. He stopped inches from her skin and said, " 'You don't want to die tonight, do you? You're not worth going to jail for.' " (*Ibid.*) He walked away, and she went to their neighbor Marychelo's apartment. Joanne was crying and shaking, and she appeared frightened. Sometime later, Joanne returned to her apartment with Marychelo. Defendant chased them back to Marychelo's apartment; he was screaming and throwing things at them. Later that night, Joanne told a police officer that she was afraid the defendant was going to kill her. At trial, however, she denied that she had entertained any fear of him that evening. (*Ibid.*)

The *Toledo* court concluded that the jury properly found that the defendant had committed the crime of attempted criminal threat: "[T]he jury might have entertained a reasonable doubt—in view of Joanne's testimony at trial that she was not frightened by defendant's statements, and the circumstance that Joanne apparently had been willing to return to her apartment with Marychelo on the night in question—as to whether the threat *actually* caused Joanne to be in such fear. Thus, the jury evidently found defendant guilty only of attempted criminal threat rather than the completed crime of criminal threat, not because defendant's conduct fell short of that required by the criminal threat provision, but simply because defendant's threat happened not to have as frightening an

impact upon Joanne as defendant in fact had intended." (*Toledo, supra*, 26 Cal.4th at pp. 235.)

In *Toledo*, the evidence showed that the victim might not have feared the defendant at all. (*Toledo, supra*, 26 Cal.4th at p. 235.) By contrast, there was no testimony that can be construed as showing M.R. did not fear defendant would kill her during the attack. M.R.'s testimony was consistent in that she believed that defendant would carry out his death threat and she was afraid of him "[*t*]*he whole night*." (Italics added.) Courts have held that a mere 15 minutes is sufficient to establish sustained fear. (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 [sustained fear occurs over "a period of time that extends beyond what is momentary, fleeting, or transitory"]; *People v. Roles* (2020) 44 Cal.App.5th 935, 942.)

Defendant makes much of M.R.'s statement that she was not afraid of defendant while having sex with him, hours after the physical altercation that left M.R. beaten, choked unconscious, burned, and with a chunk of hair ripped from her head. However, this testimony did not warrant instruction on the lesser included offense because M.R. had already suffered sustained fear for *hours* – a duration clearly sufficient for the element of fear set forth in section 422. And, as we have discussed, consideration of this evidence as pure impeachment of the victim's numerous and consistent assertions that she was in fear during the earlier (relevant) time period is not the "substantial evidence" that is required to merit sua sponte instruction on the lesser.

Reviewing the record as a whole, we discern no substantial evidence that would have supported an instruction on the lesser included offense of attempted criminal threat. We conclude the trial court did not err in refusing to instruct on attempted criminal threat.

## II.

### *Retroactive Application of Senate Bill 136*

Defendant contends, and the Attorney General agrees, that defendant's one-year prior prison term enhancement – imposed under section 667.5, former subdivision (b) – must be stricken. We shall strike the enhancement.

Effective January 1, 2020, Senate Bill 136 amended section 667.5, subdivision (b), to remove the one-year enhancement for prior prison terms, except when the offense underlying the prior prison term was a sexually violent offense. (See § 667.5, subd. (b).) The offenses underlying defendant's prior prison terms were not sexually violent offenses. (§ 667.5, subd. (b); Welf. & Inst. Code, § 6600, subd. (b).) Because Senate Bill 136 reduces sentences for a crime it applies retroactively to convictions not final on appeal absent evidence of a contrary legislative intent. (See *People v. Brown* (2012) 54 Cal.4th 314, 323-324; *In re Estrada* (1965) 63 Cal.2d 740, 745.) The enactment therefore applies to this case, and we strike defendant's one-year prior prison term enhancement.

### DISPOSITION

We modify the judgment to strike defendant's one-year prior prison term enhancement imposed under section 667.5, former subdivision (b). The judgment is otherwise affirmed. The clerk of the superior court is directed to prepare an amended

abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.

/s/
HOCH, J.

We concur:

/s/
ROBIE, Acting P. J.

/s/
DUARTE, J.